IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MARINE OFFICE OF AMERICA CORP., ET ALS.    *
     Plaintiffs    *
         *    CIVIL NO. 98-2359 (GG)
     v.    *
         *
LILAC MARINE CORPORATION, ET ALS.    *
     Defendants    *
* * * * * * * * * * * * * * * * * * * *

**OPINION AND ORDER**

Pending before this court is the plaintiffs' motion for partial summary judgment and the defendants' cross motion for summary judgment. (Docket entries #37, 43, 46, 47, 54 & 59).

**BACKGROUND**

This is an action in admiralty and a damaged cargo claim under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1301, *et seq.* filed by Marine Office of America Corporation ("MOAC"), Continental Insurance Company ("Continental") and TradeArbed, Inc. ("TradeArbed"). The claim arises from a shipment of 8,678 bundles of reinforced steel bars ("rebars") sold to Otto Wolff Handelsgesellschaft mbh ("Otto Wolff") by TradeArbed. The cargo was loaded at the port of Odessa, Ukraine, on the vessel M/V Cape Cornwall ("Cape Cornwall"), owned by Lilac Marine Corporation ("Lilac"). The cargo's final destination was San Juan, Puerto Rico. (Docket entry #1).

*for to all parties*
*11/13/03*

(63)

CIVIL NO. 98-2359 (GG)                                                    2

As part of the terms of the contract, TradeArbed insured the cargo with a policy issued under its name by co-plaintiffs MOAC and Continental. A cargo inspection performed by Otto Wolff and TradeArbed before taking delivery of the cargo at the port of San Juan revealed that a number of bundles of rebars had been damaged by saltwater while onboard the Cape Cornwall. Subsequently, their surveyors came to an agreement as to the extent of saltwater damages sustained by the rebars. Based on the recommendations of the surveyors, TradeArbed and Otto Wolff agreed that a depreciation allowance of 33% from TradeArbed's invoice price would be made to reflect the extent of the damages sustained. In consideration of this depreciation allowance, Otto Wolff agreed to take delivery of the rebars in their partially damaged condition. The depreciation allowance was subsequently credited by TradeArbed to Otto Wolff. In turn, the price depreciation plus other related expenses, incurred by TradeArbed as a result of the saltwater contamination of the rebars, was paid by MOAC and Continental.

On December 4, 1998, MOAC, Continental and TradeArbed filed the above captioned action against Lilac seeking compensation in the amount of $126,370.14 for the damages and expenses incurred by them as a direct result of the rust damage suffered by the rebars while onboard the Cape Cornwall. (Docket entry #1). Lilac denies any responsibility. (Docket entries #12 & 32).

After several procedural events, the plaintiffs filed a motion for partial summary judgment arguing that: (1) they have established

CIVIL NO. 98-2359 (GG)                                                    3

a *prima facie* case under COGSA against the defendants for the damaged
rebars; (2) the defendants are not entitled to any form of
exoneration for the saltwater contamination of the rebars because
they failed to provide a seaworthy vessel; and (3) the most
appropriate and just measure to compensate the damages caused by the
defendants' negligence is the depreciation allowance agreed to
between TradeArbed and Otto Wolff.  (Docket entry #37).

        The defendants opposed the motion for partial summary judgment
and filed a cross motion requesting that the complaint be dismissed
because the title to the cargo was, at all relevant times, in the
name of the buyer, Otto Wolff, who was compensated by the seller,
TradeArbed.  The defendants theorize that since Otto Wolff did not
cede its subrogation rights to TradeArbed, his insurer was not the
real party in interest and could not maintain this action.  In
addition, the defendants claim that, in the event they are found
liable, the damages be set in accordance with the diminution of
market value formula.  (Docket entry #43).  The plaintiffs replied
alleging that they are real parties in interest to this litigation
and have recoverable damages as a result of the defendants'
negligence because the defendants waived the real party in interest
defense by failing to raise it in a timely fashion.  The defendants
counter the waiver argument by stating that in their answer to the
complaint they reserved the right to add affirmative defenses and
that they learned during the discovery process that TradeArbed lacked
title to the goods.  (Docket entry #54).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." **See**, Rule 56(c) of the Fed.R.Cv.P.; Sands v. Ridefilm Corp., 212 F.3d 657, 660-661 (1st Cir. 2000); Borshow Hosp. & Medical Supplies, Inc. v. Cesar Castillo, Inc., 96 F.3d 10, 14 (1st Cir. 1996). A genuine issue will exist only if a material conflict in the evidence warrants trial because the disputed fact has the potential of changing the outcome of the suit under the governing law. **See**, Anderson v. Liberty Lobby, Inc., 477 J.S. 242, 247-48 (1986); McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995); Martínez v. Colón, 54 F.3d 980, 983 (1st Cir. 1995).

The initial burden of showing "the absence of a genuine issue concerning any material fact" falls on the party moving for summary judgment. **See**, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997). If said burden is established, then the nonmoving party is required to show that summary judgment is inappropriate.

When considering a motion for summary judgment, the court reviews the record in the light most favorable to the nonmoving party and indulges all inferences favorable to that party. **See**, Celotex,

CIVIL NO. 98-2359 (GG)                                                    5

477 U.S. at 324-25; Fernándes v. Costa Bros. Masonry, Inc., 199 F.3d
572, 577 (1st Cir. 1999); McCarthy, 56 F.3d at 315; Byrd v. Ronayne,
61 F.3d 1026, 1030 (1st Cir. 1995); Mesnick v. General Elec. Co., 950
F.2d 816, 822 (1st Cir. 1991), cert. denied by 504 U.S. 985 (1992).
This is so because, the nonmoving party cannot avoid summary judgment
by "simply show[ing] there is some metaphysical doubt as to the
material facts." See, Matsushita Elec. Indus. Co., Ltd. v. Zenith
Radio Corp., 475 U.S. 574, 586-587 (1986); Woods v. Friction
Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994). Neither can it
rest upon "improbable inferences, and unsupported speculation nor
upon mere allegations or denials of his pleading". See, Anderson,
477 U.S. at 256; Barbour v. Dynamics Research Corp., 63 F.3d 32, 37
(1st Cir. 1995), cert. denied by 516 U.S. 1113 (1996); Medina-Muñoz
v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st Cir. 1990). On the
contrary, to properly oppose a summary judgement motion, the
nonmoving party needs to proffer sufficiently competent and probative
evidence to how differing versions of the facts justify a trial.
See, National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735
(1st Cir. 1995), cert. denied by 515 U.S. 1103 (1995); Milton v. Van
Dorn Co., 961 F.2d 965, 969 (1st Cir. 1992). Nonetheless, summary
judgment "admits of no room for credibility determinations, no room
for the measured weighing of conflicting evidence such as the trial
process entails." Casas v. Mita, 42 F. 3d 668, 684 (1st Cir. 1994).

CIVIL NO. 98-2359 (GG)                                                    6

**UNCONTESTED FACTS**

Pursuant to the provisions of Rule 56(d) of the Federal Rules of Civil Procedure, and after having examined the evidence submitted by the parties in their motions, we make the following findings of material facts which are uncontested:

1.    This is a cargo claim filed under the COGSA, *supra*, arising from a shipment of 8,678 bundles of rebars loaded at the port of Odessa, Ukraine, on the vessel Cape Cornwall, and discharged at San Juan, Puerto Rico.

2. TradeArbed had an agreement to sell 8,678 bundles of rebars to Otto Wolff under the terms C.I.F. San Juan, Puerto Rico, Duty Paid, including Wharfage and Excise Tax.  Based on the terms of the contract, TradeArbed insured the rebars under an open cargo policy issued by MOAC and Continental.  This insurance policy was under TradeArbed's name.

3.    Pursuant to the terms and conditions of the purchase and sale agreement between TradeArbed and Otto Wolff, any damage claims arising out of fresh water and/or atmospheric rust would not give grounds for rejecting the rebars and would not be accepted by TradeArbed.

4.    Eurogal Surveys, Ltd./General Surveys Ltd. ("General Surveys") was hired by Cape Cornwall's insurance company, London Steamship Owner's Mutual Association Limited ("London Steamship"), to conduct a preloading survey of the cargo at the port of Odessa.

CIVIL NO. 98-2359 (GG)                                                    7

It stems from the survey that the salinity tests performed on random pieces of cargo proved that the cargo was not in contact with saltwater.  Based on this preloading survey the following remarks were included in the Bill of Lading and the Mate's Receipt:

> a. Cargo stored at port open yard unprotected from elements.
> b. Cargo wet before shipment.
> c. Cargo partly rust stained.
> d. Rust on ends.
> e. 3% of Bundles: Bundle pieces projecting on ends-some pieces bent.
> f. 1% of Bundles: Some bundle pieces bent along entire length.
> g. Several bundles: Wire strap torn/missing.

5.  The Cape Cornwall made stops in a number of discharge ports in the U.S. Mainland to unload part of the steel cargo carried onboard the vessel.  London Steamship hired National Marine Consultants ("National Marine") to perform survey inspections at discharge ports to protect the owner's interest concerning allegations of seawater damage to the steel cargo carried onboard the Cape Cornwall.  Upon the Cape Cornwall's arrival at the discharge ports of Gloucester City, New Jersey on February 3, 1998 and of Baltimore, Maryland on February 6, 1998, survey inspections were performed finding that a number of rebars showed signs consistent with seawater ingress through the hatch covers due to faulty rubber gaskets.

CIVIL NO. 98-2359 (GG)                                              7

It stems from the survey that the salinity tests performed on random pieces of cargo proved that the cargo was not in contact with saltwater.   Based on this preloading survey the following remarks were included in the Bill of Lading and the Mate's Receipt:

> a. Cargo stored at port open yard unprotected from elements.
>
> b. Cargo wet before shipment.
>
> c. Cargo partly rust stained.
>
> d. Rust on ends.
>
> e. 3% of Bundles: Bundle pieces projecting on ends-some pieces bent.
>
> f. 1% of Bundles: Some bundle pieces bent along entire length.
>
> g. Several bundles: Wire strap torn/missing.

   5.   The Cape Cornwall made stops in a number of discharge ports in the U.S. Mainland to unload part of the steel cargo carried onboard the vessel.  London Steamship hired National Marine Consultants ("National Marine") to perform survey inspections at discharge ports to protect the owner's interest concerning allegations of seawater damage to the steel cargo carried onboard the Cape Cornwall.  Upon the Cape Cornwall's arrival at the discharge ports of Gloucester City, New Jersey on February 3, 1998 and of Baltimore, Maryland on February 6, 1998, survey inspections were performed finding that a number of rebars showed signs consistent with seawater ingress through the hatch covers due to faulty rubber gaskets.

CIVIL NO. 98-2359 (GG)                                                    8

6.  During February 6, 8 and 11, 1998, survey inspections were performed on the cargo onboard the Cape Cornwall while discharging in Baltimore, Maryland.  These were made by Luard & Company on behalf of the charterers of the vessel.  According to the report, all the holds showed signs of seawater entry which evidenced a pattern of poor housekeeping, affecting the watertight integrity of the Cape Cornwall's cargo holds.

7.  Upon arrival at the discharge port of Georgetown, South Carolina on February 11, 1998, another survey report was performed on the cargo of rebars showing heavy orange rust with strong positive reaction to chlorides consistent with seawater ingress through the hatch covers due to faulty rubber gaskets.

8.  When the cargo finally arrived in San Juan, Puerto Rico on February 21, 1998, Otto Wolff sent Pasquale Catanzaro, a marine surveyor, to inspect the cargo.  TradeArbed also hired its own marine surveyor, Captain Gregory Yoos, to perform an inspection of the rebars. They found that approximately 1,095.23mt of rebars had suffered some degree of rust damage due to saltwater ingress into the cargo holds.  According to their reports, the saltwater water damage was caused by worn out and/or deteriorated gasket channels of the vessel which allowed saltwater ingress through the hatch covers.

9.  Amado Cordero, the surveyor representing the vessel's P&I interest, was contacted by counsel Blasini[1] before the ship's arrival

_____

[1]Jorge Blasini, Esq. is the legal representative in this case of the defendants.

CIVIL NO. 98-2359 (GG)                                                                    9

at the San Juan Port to conduct an inspection of the Cape Cornwall. Though he arrived at the ship the same day that it docked, he confronted problems with the ship's captain who at first denied him permission to board the same.  The following day he was able to board the vessel but the San Juan cargo had practically already been unloaded.  He never inspected the cargo after it was discharged.  He was only able to examine onboard the vessel cargo hold No. 7 where he found that approximately 250 bundles of forty footer rebars were extremely rusted and contaminated with saltwater.

10. The defendants were not represented in the joint survey made between Catanzaro and Yoos because Cordero declined the invitation made by Yoos to attend the same.

11. In an effort to mitigate damages TradeArbed offered Otto Wolff to buy the damaged rebars at a price discount.  Otto Wolff agreed and accepted delivery of the damaged rebars at a 33% depreciation from the invoice price. Accordingly, TradeArbed credited Otto Wolff $121,693.15 due to the damages sustained by the rebars.

12. In turn, TradeArbed presented to MOAC and Continental a claim for $126,370.14 as a result of the damages sustained by the rebars due to saltwater contamination.  This amount included Otto Wolff's credit plus freight allowance, Otto Wolff's surveyor fees and TradeArbed's surveyor fees.

13. MOAC and Continental reimbursed TradeArbed $124,995.14 for the claim presented. They paid the entire claim except $1,375.00 that corresponded to Otto Wolff's surveyor fees.

CIVIL NO. 98-2359 (GG)                                                        10

**REAL PARTY IN INTEREST AND WAIVER**

The defendants allege that the plaintiffs do not have a valid
cause of action against them because they are not the real party in
interest.  The defendants base this allegation on the theory that
since the contract between TradeArbed and Otto Wolff was C.I.F.
(Cost, Insurance and Freight)[2], both the risk and the title to the
goods were transferred to Otto Wolff at the port of loading.  Since,
TradeArbed did not have title to the goods it could not validly
submit a claim to MOAC and Continental (the insurance companies) for
the damages to the cargo.  *Ergo*, that MOAC and Continental cannot
claim, in subrogation, the right of TradeArbed who was not the
titleholder nor owner of the cargo here in question.  In response,
the plaintiffs argue that the defendants raised this defense in an
untimely fashion, thus, that they waived the same.  Specifically, the
plaintiffs argue that defendants waited until the eleventh hour,
almost two (2) years since the filing of its answer to the complaint[3]
and eight (8) months after the scheduled bench trial date[4], to raise
the defense that the plaintiffs were not real parties with interest

---

[2]

The term C.I.F. (Cost, Insurance, Freight) is generally
defined as a sales price that includes the cost of the marine
insurance as well as the transportation, at buyer's risk, to the
named port of destination. **See**, Thomas J. Schoenbaum, <u>Admiralty and
Maritime Law</u>, Practitioner Treatise Series, Volume 2, 3rd Ed., West
Group, St. Paul, MN, 2001, p. 3.

[3] September 29, 1999.

[4] October 31, 2000.

AO 72A
(Rev.8/82)

CIVIL NO. 98-2359 (GG)                                    11

in this litigation.  The defendants counter alleging that in the
answer to the complaint they reserved the right to amend or add
additional affirmative defenses as discovery proceedings developed
and that it was precisely during the discovery process that they
found out the facts giving support to the defense of real party in
interest.

An objection on real party in interest grounds should be
raised with reasonable promptness.  If it is not raised in a timely
or seasonable fashion, the general rule is that the objection is
deemed waived.  **See**, 6A Charles Alan Wright & Arthur R. Miller,
*supra*, § 1554 at 407; <u>Allegheny Intern. v. Allegheny Ludlum Steel
Corp.</u>, 40 F.3d 1416, 1431 (3rd Cir. 1994); <u>Sun Refining v. Goldstein
Oil</u>, 801 F.2d 343, 345 (8th Cir. 1986); <u>Harris v. Illinois-California
Exp., Inc.</u>, 687 F.2d 1361, 1373 (10th Cir. 1982).  This is so because,
failure to plead affirmative defenses in the answer to the complaint
may result in waiver of the defense and its exclusion from the case.
**See**, Rule 8(c) of the Federal Rules of Civil Procedure.  It is
hornbook law that a defendant has a duty to give the opposing party
notice of it's affirmative defenses and a chance to develop evidence
and offer arguments to controvert them.  **See**, <u>Wolf v. Reliance Std.
Life Ins. Co.</u>, 71 F.3d 444, 449-450 (1st Cir. 1995); <u>Conjugal
Partnership v. Conjugal Partnership</u>, 22 F.3d 391, 400 (1st Cir. 1994);
<u>Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.</u>, 15 F.3d 1222, 1226 (1st
Cir. 1994).  This duty stems from Rule 8(c)'s core purpose to act as
a safeguard against surprise and unfair prejudice.  **See**, <u>Wolf v.

CIVIL NO. 98-2359 (GG)                                              12

Reliance, 71 F.3d at 450.   Nonetheless, the waiver rule should not
be applied automatically.  The substance of certain unpleaded
affirmative defenses may be asserted at a later stage of the
proceedings if there is no prejudice to the opposing party, the
defense was raised at a pragmatically sufficient time or when justice
so requires.  **See**, 5 Charles Alan Wright & Arthur R. Miller, Federal
Practice and Procedure, §1278, (2nd Ed. 1990), pp. 491 & 494; Conjugal
Partnership v. Conjugal Partnership, 22 F.3d at 400.

In the case at bar, the only party properly identified in the
bill of lading is TradeArbed as the shipper of the cargo.   However,
the consignee is named as "To the Order".   Moreover, the bill of
lading does not contain the terms of the sales contract (C.I.F.)
between Otto Wolff and TradeArbed.[5]  Likewise, the complaint makes no
mention of either the terms of the contract and/or Otto
Wolff/Ferromontan.   On the contrary, the complaint identifies
TradeArbed as "the **owner** for value, **shipper, consignee** and **person in
interest** in the shipment of the cargo." (Our emphasis).   **See**,
Complaint, p.4 (Docket entry #1).   In addition, it is stated in the
complaint that the insurance companies appearing as plaintiffs,
namely MOAC and Continental, paid to the owners and/or holders of

---

[5] A bill of lading, also known as a waybill, "is a receipt
given by the master of a ship acknowledging that the goods specified
in the bill have been put on board" and "is the document [that]
contains the terms of the contract for the carriage of the goods
agreed upon between the shipper of the goods and the shipowner."
William R. Anson, Principles of the Law of Contract 380 (Arthur L.
Corbin ed., 3d Am. ed. 1919), quoted in Black's Law Dictionary 159
(7th ed. 1999).

CIVIL NO. 98-2359 (GG)                                                13

interests of [the] shipment for the loss caused, and have thus
subrogated in their rights...". *Id.* at p. 13. In view of the above,
there is nothing in the record to contradict the defendants'
assertion that it was not until the discovery process, specifically
the answer to Lilac's First Set of Interrogatories[6], that they first
became aware of the facts giving rise to the real party in interest
defense and were in a position to properly raise the same.

On the other hand, during the discovery process the parties
encountered multiple problems that generated changes in the Initial
Scheduling Order. For instance, new discovery deadlines and dates
for the Pre-Trial Conference were scheduled. However, no new dates
were set for the filing of dispositive motions. (Docket entries #19,
21-23, 25 & 30). It was in the Proposed Pre-Trial Order where, for
the first time, the defendants asserted the grounds for the real
party in interest defense which several months later they amplified
in the opposition to the partial motion for summary judgment.
(Docket entry #33). Though it is uncontested that the Proposed Pre-
Trial Order was filed one day before the scheduled Pre-Trial
Conference and twenty-six (26) days before the scheduled Trial, the
fact remains that both events were set aside *sine die*. (Docket entry
#34). More to the plaintiffs' demise, they have failed to establish
how they have been prejudiced by the defendants' assertion of the
real party in interest defense at the procedural stage in which it

---

[6] The interrogatory was answered by the plaintiffs on March 23,
2000. **See**, Defendants' Reply to the Plaintiffs' Opposition to the
Defendants' Cross Motion for Summary Judgment, Exhibit #1, docket
entry #54.

CIVIL NO. 98-2359 (GG)                                                    14

was raised.  By asserting the grounds of the defense in the Proposed

Pre-Trial Order, the defendants put the plaintiffs on notice of the

same eight (8) months before they requested the court to act on it

by seeking the dismissal of the action pursuant to Rule 17 (a),

*supra*.   In short, we find that the plaintiffs had notice of the

defendants' concern on this matter and had plenty of time to prepare

to defend themselves.    Thus, the plaintiffs' argument that the

defendants waited until the eleventh hour is without merit.

Now let us address the argument that the plaintiffs do not

have a cause of action because they did not have title to the goods

and therefore could not sue the carrier.  The defendants contend that

the plaintiffs cannot claim in subrogation rights that its assured

did not have. As previously discussed, the claimant must be the real

party in interest.  The purpose of Rule 17(a)[7] of Federal Rules of

Civil Procedure is to require that actions be prosecuted in the name

of the real party in interest so that the carrier may know against

whom he must defend himself and be protected against a subsequent

action by another party.  **See**, <u>Prevor-Mayorsohn Caribbean, Inc. v.</u>

<u>Puerto Rico Marine Management, Inc.</u>, 620 F.2d 1, 4 (1st Cir. 1980).

The general rule under an ordinary C.I.F. contract is that the

seller/shipper's title to the goods may be transferred to the

buyer/consignee upon delivery to the carrier at the port of loading.

---

[7]

Federal Rules of Civil Procedure 17(a), in its pertinent part
provides that every action shall be prosecuted in the name of the
real party in interest. **See**, <u>Prevor-Mayorsohn Caribbean, Inc. v.</u>
<u>Puerto Rico Marine Management, Inc.</u>, *supra*.

CIVIL NO. 98-2359 (GG)                                                    15

**See**, D.M. Day, <u>The Law of International Trade</u>, 4 (1981). **See also**, <u>Kumar Corp. v. Nopal Lines, Ltd.</u>, 462 So.2d 1178, 1183 (Fla. App. 3 Dist. 1985) *petition for review denied by* <u>S.E.L. Maduro (Florida), Inc. v Kumar Corp.</u>, 476 So. 2d 675 (Fla. 1985). As a result of said title transfer the consignee/buyer is ordinarily the party entitled to sue the carrier in case of any damage. However, the seller/shipper may also sue the carrier: (1) when he acts as the consignee's representative, if said action is ratified by the later; (2) when the shipper acted as the buyer/consignee's agent in replacing and repairing the damaged cargo; or (3) when the goods are rejected by the buyer and the seller accepts that rejection. **See**, William Tetley, <u>Marine Cargo Claims</u>, 3rd ed., BLAIS, Canada, 1988, p. 192; <u>Prevor-Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Management, Inc.</u>, 620 F.2d at 4. **See also**, <u>Armco Intern. Corp. v. Rederi A/B Disa</u>, 151 F.2d 5, 9 (2nd Cir. 1945); <u>Transmarine Corp. v. Levitt</u>, 25 F.2d 275, 278 (2nd Cir. 1928). It is the third situation above mentioned the one that confers TradeArbed, *ergo* MOAC and Continental in subrogation, the right to sue in this case.

It stems from the record that after delivery and the surveyors' findings that the cargo in question had been contaminated with saltwater, TradeArbed and Otto Wolff engaged in negotiation efforts regarding the damaged cargo. Pursuant to the terms of the sales contract, Otto Wolff was contractually entitled to reject

delivery of the damaged rebars.[8] TradeArbed, in its efforts to mitigate damages, considered retaining the goods and selling them at salvage. However, since the rebar market was glutted[9], it would have been impossible to achieve in open bidding a return at salvage of 67%. Faced with that, TradeArbed followed its surveyor's recommendation that it was better to offer Otto Wolff a 33% depreciation allowance off from the invoice price. **See**, Letter of March 25, 1998, Motion for Partial Summary Judgment, Exhibit #18, *supra*. The offer was eventually accepted by Otto Wolff.

In view of all of the above, we find that since Otto Wolff accepted the offer of a deduction allowance for the loss, TradeArbed assumed the loss and consequently, became vested with the right to sue Lilac, the carrier. Likewise, MOAC and Continental, by reimbursing TradeArbed for its loss, became as well parties in interest to this litigation.

### PRIMA FACIE CASE UNDER COGSA

In order to establish the carrier's liability for loss or damage to cargo under COGSA, the claimant must first establish a

---

[8] Under the sales contract, the parties agreed that the only type of rust damage that would not serve as grounds for rejection of the cargo by the buyer was fresh water/sweet water atmospheric rust because the same was not considered detrimental to the overall use and condition of the cargo and, hence, was not covered by any maritime insurance policy. **See**, Contract of Sales, Exhibit #4, Motion for Partial Summary Judgment, docket entry #37.

[9] **Glutted:** to flood (the business market) with goods so the supply exceeds demand. Webster's Third New International Dictionary, G. & C. Merriam Company, Springfield, MA, 1976.

*prima facie* case to demonstrate that the goods were damaged while in the custody of the carrier. **See**, EAC Timberlane v. Pisces, Ltd., 745 F.2d 715, 719 (1st Cir. 1985). In this case, the plaintiffs must establish that: (1) the rebars were delivered to the carrier in good condition; and (2) they were discharged in damaged condition. **See**, Thomas J. Schoenbaum, Admiralty and Maritime Law, Practitioner Treatise Series, Vol. II, Chapter 10, §10-22, 3rd Ed., West Group, 2001, p. 106. **See**, Greenburg v. P.R. Maritime Shipping Authority, 835 F.2d 932, 934 (1st Cir. 1987); EAC Timberland v. Pisces, Ltd., 145 F2d at 719.

Under COGSA, the bill of lading constitutes *prima facie* evidence that the carrier received the goods therein described. A bill of lading that details the goods transported and their condition with no notations of damage is a "clean bill of lading". Such a bill of lading may be ordinarily relied upon to establish the shipper's *prima facie* case as evidence of what was turned over to the carrier. **See**, EAC Timberlane v. Pisces, Ltd., 745 F.2d at 719; Florencio Roman, Inc. v. CTMT, Inc., 614 F.2d 9, 10 (1st Cir. 1984); Cigna Ins. Co. of Puerto Rico v. M/V Skanderborg, 897 F.Supp. 659 (D. Puerto Rico 1995).

However, the shipper is not limited to a clean bill of lading to show good order and condition of cargo at port of shipment. It can also establish a *prima facie* case by showing, from condition of cargo as delivered or otherwise, that the damage occurred while the cargo was in the carrier's custody or was caused by the carrier's

CIVIL NO. 98-2359 (GG)                                          18

negligence. **See**, <u>TradeArbed, Inc. v. M/V Swallow</u>, 688 F.Supp. 1095,

1106 (E.D. La. 1988). This requires proof that the cargo was in

damaged condition on delivery or discharge. The shipper must

introduce credible evidence of the extent of the damage on delivery

of the goods. **See**, <u>Greenburg v. Puerto Rico Maritime Shipping</u>

<u>Authority</u>, 835 F.2d at 934. The establishment of the *prima facie*

case is also affected by section 3(6) of COGSA, 46 U.S.C. § 1303(6),

which provides in relevant part that:

> Unless notice of loss or damage and the
> general nature of such loss or damage be
> given in writing to the carrier or his agent
> at the port of discharge before or at the
> time of the removal of the goods into the
> custody of the person entitled to delivery
> thereof under the contract of carriage, such
> removal shall be *prima facie* evidence of the
> delivery by the carrier of the goods as
> described in the bill of lading....The
> notice in writing need not to be given if
> the state of the goods has at the time of
> their receipt been subject of joint survey
> or inspection.

The bill of lading in this case included notations that the

cargo had been stored at the port in open yard unprotected from the

elements, it was wet before shipment, was partly rust stained, had

rust on the ends and some bundle pieces were bent. **See**, Bill of

Lading, Exhibit #1, Motion for Partial Summary Judgment, *supra*. The

defendants argue that these notations contradict the fact that the

steel was in good condition. We disagree.

First of all, such standardized notations refer to

nondamaging, atmospheric rust that does not affect the value of steel

CIVIL NO. 98-2359 (GG)                                              19

and it is still considered to be in "prime" condition. **See,** <u>Thyssen,</u>
<u>Inc. v. S/S Eurounity</u>, 21 F.3d 533, 538 (2nd Cir. 1994). Second, the
survey performed by General Surveys prior to loading also establishes
that the cargo was wet due to recent rains and that the salinity
tests performed on random pieces of cargo showed that it was not in
contact with saltwater. **See,** General Surveys, Ltd. Survey Report,
Exhibit #3, Motion for Partial Summary Judgment, *supra*. The record
is devoid of any evidence that controverts TradeArbed's claim that
the notations on the bill of lading indicate anything other than the
sound condition of the steel upon loading. In sum, it is uncontested
that the cargo was handed to the carrier in good condition.

As for the second prong of the *prima facie* case, when the Cape
Cornwall arrived at San Juan, Puerto Rico on February 21, 1998, Otto
Wolf sent Mr. Catanzaro to inspect the cargo prior to taking
delivery. Mr. Cantanzaro found that approximately 1,095.23m/t of the
rebars had suffered some degree of rust damage due to saltwater
ingress into the cargo holds. According to his report, the saltwater
damage was caused by faulty hatch covers and worn out and/or
deteriorated gasket channels allowing for water ingress through the
hatch covers. **See,** Pasquale Catanzaro's Survey Report, Exhibit #11,
Motion for Partial Summary Judgment, *supra*. TradeArbed's surveyor,
Capt. Yoos also performed an inspection of the rebars wherein he
reached the same conclusion as Mr. Catanzaro regarding the amount of
rebars that had suffered saltwater rust damage. **See,** Capt. Yoos'
Survey Report and Letter of April 13, 1998 to Hank Benima,

CIVIL NO. 98-2359 (GG)                                              20

TradeArbed's Claims Manager, Exhibits #12 & 13, *supra*.  In addition,

the ship's surveyor stated in his report that cargo in Hold No. 7 had

been contaminated with saltwater.  **See**, Consultation of Cargo Loss

by Captain Paul W. Simpson, Exhibit C, Memorandum of Law on the

Measure of Damages Utilizing Fair Market Value, docket entry #32.

Since the bill of lading indicates that the rebars were in

good condition prior to the voyage, and the joint surveys performed

before taking delivery of the rebars show that the steel was in a

damaged condition at out turn, the plaintiffs have established *a*

*prima facie* case.  Accordingly, the plaintiffs now do not have to

produce evidence of fault of the carrier nor provide an explanation

of why the goods were damaged.  **See**, EAC Timberlane v. Pisces, Ltd.,

745 F.2d at 719; **See also**, M. Golodetz Export Corp. v. S/S Lake Anja,

751 F.2d 1103 (2d Cir. 1985) *certiorari denied by* S/S Lake Anja v.

M. Goldetz Export Corp., 471 U.S. 1117 (1985); Nissho-Iwai Co., Ltd.

v. M/T Stolt Lion, 719 F.2d 34 (2d Cir. 1983), *on remand* 1984 WL 365

(S.D.N.Y. 1984).  This is so because, under COGSA, if the shipper

proves a *prima facie* case and there is evidence of unseaworthiness,

the burden of proof shifts to the carrier to show either: (1) the

exercise of due diligence on his part, that is, the absence of

causation; or (2) that the harm was caused by one of the excepted

CIVIL NO. 98-2359 (GG)                                                    21

causes listed in §1304(2) of COGSA[10].  If the carrier cannot show one

of these two factors, it will be held liable.


**DUTY TO PROVIDE A SEAWORTHY VESSEL**


Section 3(1) of COGSA, 46 U.S.C. § 1303(1), provides that the

carrier should be bound before and at the beginning of the voyage to

exercise due diligence to: (a) make the ship seaworthy; (b) properly

man, equip, and supply the ship; and (c) make the holds, and all

other parts of the ship in which the goods are carried, fit and safe

for their reception, carriage and preservation.  On the same vein,

Section 4(1) of COGSA, 46 U.S.C. §1304(1), establishes that neither

the carrier nor the ship is liable for loss or damage resulting from

unseaworthiness unless caused by want of due diligence on part of the

carrier to make the ship seaworthy.  Whenever loss or damage has

resulted from unseaworthiness, the burden of proving the exercise of

due diligence shall be on the carrier or other persons claiming

exemption under this section.

Seaworthiness may be defined as the state of a vessel in such

a condition, with such equipment, and manned by such a master and

---

[10]  Section 1304(2) provides that neither the carrier nor the
ship shall be responsible for loss or damage arising or resulting
from, among others, an act of omission of the shipper or owner of the
goods, his agent or representative or any other cause arising without
the actual fault and privity of the carrier and without the fault or
neglect of the agents or servants of the carrier.

CIVIL NO. 98-2359 (GG)                                               22

crew, that normally the cargo will be loaded, carried, cared for and
discharged properly and safely on the contemplated voyage. Examples
of seaworthiness are: (1) a tight hull and hatches; (2) a proper
system of pumps, valves and boilers; and (3) engines, generators and
refrigeration equipment operating in good order. Faulty or damaged
hatches are a constant source of damage to cargo, *ergo*, a constant
source of litigation. Hatches should be tight, if there is to be
seaworthiness. **See**, William Tetley, *supra*, at p. 381-388; **See also**,
Sears, Roebuck & Co. v. American President Lines, 345 F.Supp. 395
(D.C. Cal. 1971).

The legal test for seaworthiness is whether the vessel is
reasonably fit to carry the cargo which it has undertaken to
transport. Obviously, a test of such generality can be applied only
on a case by case basis, considering the particular and relevant
facts of the situation at hand. **See**, The Sylvia, 171 U.S. 462, 464
(1898). The duty to provide a seaworthy vessel at the beginning of
the voyage is nondelegable, and the carrier is accordingly
responsible for the acts of third persons. **See**, International Nav.
Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 226 (1901). The inquiry
of whether due diligence has been exercised once an unseaworthy
condition has been found is a question of fact to be determined by
the evidence presented. **See**, Martin v. Southwark, 191 U.S. 1 (1903).

The plaintiffs presented the survey inspections performed at
different discharge ports prior to the vessels arrival at Puerto Rico
which showed that the saltwater contamination of the steel cargo was

CIVIL NO. 98-2359 (GG)                                           23

consistent with seawater ingress into the cargo holds due to faulty hatch covers and worn out and/or deteriorated rubber gasket channels. **See**, Surveys, Exhibits #6-12, Motion for Summary Judgment, *supra*. This evidence has not been disputed by the defendants. **See**, Defendants' Answer to Plaintiffs' Statement of Uncontroverted Facts, ¶¶8-15, docket entry #43. Moreover, as previously discussed, faulty hatch covers and worn out and/or deteriorated gasket channels make the Cape Cornwall unseaworthy. Therefore, we find that the defendants have failed to comply with their duty to provide a seaworthy vessel. In sum, the plaintiffs' motion for partial summary judgment as to the issues of a *prima facie* case and unseaworthiness must be and is hereby **GRANTED**. Thus, the burden of proof has now been shifted to Lilac to establish the exercise of due diligence or that the damaged to the cargo was caused by one of the excepted causes listed in Section 1304(2) of COGSA.


**METHOD OF COMPUTATION OF DAMAGES**


The plaintiffs allege that the depreciation allowance agreed to between TradeArbed and Otto Wolff as to the damaged rebars is the most appropriate and just measure to compensate the damages resulting from the defendants' negligence. In contrast, the defendants oppose arguing that the appropriate measure of damages is the market value formula because the plaintiffs' position is based merely on a visual inspection with no scientific or commercial methodology.

consistent with seawater ingress into the cargo holds due to faulty hatch covers and worn out and/or deteriorated rubber gasket channels. **See**, Surveys, Exhibits #6-12, Motion for Summary Judgment, *supra*. This evidence has not been disputed by the defendants. **See**, Defendants' Answer to Plaintiffs' Statement of Uncontroverted Facts, ¶¶8-15, docket entry #43. Moreover, as previously discussed, faulty hatch covers and worn out and/or deteriorated gasket channels make the Cape Cornwall unseaworthy. Therefore, we find that the defendants have failed to comply with their duty to provide a seaworthy vessel. In sum, the plaintiffs' motion for partial summary judgment as to the issues of a *prima facie* case and unseaworthiness must be and is hereby **GRANTED**. Thus, the burden of proof has now been shifted to Lilac to establish the exercise of due diligence or that the damaged to the cargo was caused by one of the excepted causes listed in Section 1304(2) of COGSA.


**METHOD OF COMPUTATION OF DAMAGES**


The plaintiffs allege that the depreciation allowance agreed to between TradeArbed and Otto Wolff as to the damaged rebars is the most appropriate and just measure to compensate the damages resulting from the defendants' negligence. In contrast, the defendants oppose arguing that the appropriate measure of damages is the market value formula because the plaintiffs' position is based merely on a visual inspection with no scientific or commercial methodology.

The purpose behind COGSA's damage recovery scheme is to make the injured party whole by properly compensating for the loss suffered. **See**, <u>Santiago v. Sea-Land Service, Inc.</u>, 366 F.Supp. 1309, 1318 (D.P.R. 1973). COGSA provides that "in no event will the carrier be liable for more than the amount of damage actually sustained". 46 U.S.C. §1304(5); <u>Thyssen, Inc. v. S/S Eurounity</u>, 21 F.3d at 540. Generally, the measure of damages is the difference between the fair market value of the goods at their destination in the condition in which they should have arrived and the fair market value in the condition in which they actually did arrive. **See**, <u>Ansaldo San Giorgio I v. Rheinstrom Brothers</u>, 294 U.S. 494, 496 (1935); <u>Illinois Central Railroad v. Crail</u>, 281 U.S. 57, 64-65 (1930). This rule is known as "Arrived Sound Market Value less Arrived Damaged Market Value" and is based on the assumption that the parties to a contract of carriage know or are expected to know that, if the cargo is damaged or lost, the claimant should be compensated for the value of the damaged or lost cargo at the time and place of the delivery or when it should have been delivered. **See**, Gilmore & Black, <u>The Law of Admiralty</u>, 182 (1975); <u>St. John N.F. Shipping Corp. v. S.A. Companhia</u>, 263 U.S. 119 (1923).

Under the market value formula, proof of market value and damages may be accomplished by using published price quotations or comparable sales, where available. **See**, William Tetley, *supra*, at 323. "Arrived Sound Market Value" is difficult to calculate unless there is a market with published listings at the place of discharge.

CIVIL NO. 98-2359 (GG)                                                    25

At times, courts have made the calculations of "Sound Market Value less Damaged Market Value" by deciding by what percentage representative samples of the cargo have depreciated and then applying that percentage to the Arrived Sound Market Value. **See,** Santiago v. Sea-land Services, Inc., *supra*. Courts have also used invoice prices *as* the value of the undamaged goods when the fair market value is uncertain or is not proven. **See,** Insurance Co. of North America v. M/V Frio Brazil, 729 F.Supp. 826, 836 (M.D. Fla. 1990).

Notwithstanding the above, the market value formula is not the only measure of damages that may be applied in maritime cargo claims to ascertain the loss that may be recovered. **See,** Hector Martinez & Co. v. Southern Pacific Transp., 606 F.2d 106, 110 (5th Cir.), reh. denied, 609 F.2d 1008 (1979), *cert.* denied, 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980); Bosung Industrial Co. v. M.V. Aegis Sonic, 590 F.Supp. 908, 914 (S.D.N.Y. 1984); Dixie Plywood Company v. S.S. Federal Lakes, 404 F.Supp. 461, 465 (S.D.Ga.) *aff'd*. 525 F.2d 691 (5th Cir.1975), *cert.* denied 425 U.S. 974, 96 S.Ct. 2174, 48 L.Ed.2d 798 (1976). Though it is commonly utilized in assessing damages, it is only **one method** and **not the exclusive measure of damages** in cargo cases. **See,** Affiliated Foods, Inc. v. Puerto Rico Marine Management, Inc., 645 F.Supp 838, 840. In other words, it need not be applied if circumstances suggest a more appropriate alternative. **See,** Illinois Central Rail Road v. Crail, 281 U.S. at

365 ("The test of market value is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to if, for special reasons, it is not exact or otherwise not applicable."); Thyssen, Inc. v. S/S Eurounity, supra; U.S. v. Palmer & Parker Co., 61 F.2d 455, 459 (1st Cir. 1932) ("the market value rule is inapplicable when, on the facts, it is not the nearest practicable approach to an ascertainment of the actual loss. Each case must be governed by its own facts."); Great Atlantic & Pac. Tea Co. v. Atchison, T. & S.F. Ry. Co., 333 F.2d 705, 708 (7th Cir.1964) cert. den. 379 U.S. 967 (1965) ("the rule is not applied in cases where it is demonstrated that another rule will better compute actual damages").

In fact, the assessment of damages in particular situations has called for the development of lesser rules, the use of common sense and the creation of exceptions, all to the end that the shipper whose property has been affected be made whole. **See**, Santiago v. Sea-Land, supra. After all, there is only one rule of universal application, and that is to give compensation for the loss suffered. **See**, U.S. v. Palmer & Parker Co., supra; Héctor Martínez and Co. v. Southern Pacific Transportation Co., 606 F.2d 106, 111 (5th Cir. 1979) cert. den. 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed. 2d 838 (1980); Dutch Enterprises, Inc. v. Consol. Freightways, Inc., 1994 WL 835069 N.D.Cal., 1994.

CIVIL NO. 98-2359 (GG)                                                    27

In this case, the plaintiffs' computation of damages is based on the findings and conclusions reached by TradeArbed and Otto Wolff's surveyors in their joint survey. During their survey they found that out of the 1,095.23 m/t of rebars that had been in contact with saltwater, 33% would have zero value. Accordingly, TradeArbed gave Otto Wolff a discount allowance on the invoice price that reflected said loss.[11] Based on that formula, TradeArbed reached the sum claimed to, and basically paid by, MOAC and Continental.[12] **See,** Plaintiffs' Memorandum of Law on Proper Method for Computing Damages and Memorandum of Law on the Measure of Damages Utilizing Fair Market Value, docket entries #31 & 32.

In contrast, the defendants' base their attack at the plaintiffs' computation of damages on Capt. Paul W. Simpson's expert report, where he calculated the damages in approximately $30,000.00. He indicates that the proper method of computing the damages in this

---

[11]  Calculations to determine total loss:

```
1,095.23 m/t - rebars in contact with saltwater
   x    33% - loss of value, discount allowance
  361.43 m/t - rebars with zero value

361.43 m/t = 7,968.09 cwt
7,968.09 cwt
x $15.24 - contracted invoice price
$121,433.69
     637.45 - freight allowance (.08 cwt)
   1,375.00 - survey fees Otto Wolff
+  2,924.00 - survey fees TradeArbed
$126,370.14 - total loss claimed to insurers
```

[12] MOAC and Continental paid $124,995.14, which was the damages claimed minus Otto Wolff surveyor's fees ($1,375.00).

CIVIL NO. 98-2359 (GG)                                                28

case is by way of the difference between the fair market value at the
port of destination less the fair market value of the cargo in its
damaged condition. Capt. Simpson's report is flawed because his
calculation is not based on real market values, namely, published
price quotations or comparable sales and is grounded on certain
presumptions that have no basis on the record. First of all, Capt.
Simpson admitted in his deposition that he did not make an
independent investigation to obtain the fair market value of the good
cargo here in question. Likewise, he admitted that he has no idea
of the market value for damaged rebars in San Juan, Puerto Rico for
the months during which the sales of the cargo took place. **See**,
Deposition Testimony, Exhibit #14, pp. 24, 80, Motion for Partial
Summary Judgment, docket entry #37.

However, without any knowledge or reasonable indication of
whether the San Juan market value for rebars was uncertain, Capt.
Simpson simply resorted to Ferromontan's[13] sale invoices of the cargo
to arrive at the values used in his damages formula. **See**, Expert's
Report, Exhibit C, p. 5, Defendants' Memorandum on the Proper Method
to Compute Damages, docket entry #32. That is, he assumed that the
sales invoices at below the purchasing price represented the sale of
damaged cargo. Hence, that the damaged material was sold at $14.70
and that good material was sold at $15.67. From there he inferred
that the difference between both invoice sales prices multiplied by

---

[13] Ferromontan is a subsidiary of Otto Wolff operating in San
Juan, Puerto Rico.

CIVIL NO. 98-2359 (GG)                                           29

the cargo sold at a discounted price was the real damage suffered by
the plaintiffs.[14] *Id.* at p. 6.  Based on this and the fact that all
the cargo was sold contrary to what was first envisioned of one third
no value cargo, he asserts that TradeArbed presented an inflated
claim loss of great proportions.  *Id.* at p. 5.

Though invoice prices of $15.67 do reflect sales of good
material, invoice prices of $14.70 do not reflect sales of damaged
cargo exclusively.  **See**, Modesto Gomez' Deposition, Exhibit #4, p.
25, Reply to Defendant's Opposition to Plaintiffs' Motion for Partial
Summary Judgment, docket entry #47. Aceros de America and Steel
Services, Inc. were the only two clients of Ferromontan who bought
the cargo object of the joint survey, that is, of the discount
allowance. **See**, Francisco Garcia and Modesto Gomez'[15] Depositions,
Exhibits E & G, docket entry #32, *supra*; Deposition of Gomez, Exhibit
#4, p. 48 *supra*.  The cargo was not segregated between good, bad,
heavy rusted, slightly rusted, and/or with zero value. On the
contrary, these clients paid for good and bad material mixed
together. **See**, Gomez' Deposition, Exhibit G, *supra*, at pp. 30, 38,
39. In fact, based on Catanzaro's report of March 10, 1998, Gomez
deducted from the cost of the good material the proportion of the

---

[14] $15.67 - 14.70 = .97$

1,391.62 m/tons = 30,679.65 cwt x .97 = $29,759.26

[15] Mr. Gómez is Ferromontan's Comptroller. He was the person
in charge of calculating the new cost of the cargo object of the
discount allowance which was deposited and sold to Aceros de América
and Steel Services, Inc.

claim Otto Wolff received from TradeArbed and distributed said allowance between the two clients who bought the cargo. That way, he arrived at the new cost which is reflected in the invoice price of $14.70 corresponding to the sales made to Aceros de America and Steel Services after May 31, 1998. **See**, *Id.* at pp. 26, 27, 47. In short, in order to sell the material, Ferromontan offered it to said clients at a lower cost which in turn reflects the same discount price that Ferromontan received from TradeArbed. **See**, *Id.* at p. 39; Distribution of Claim, Exhibit E, Plaintiffs' Memorandum of Law on Proper Method for Computing Damages, docket entry #31. In view of the above, it is clear that Capt. Simpson's reliance on the $14.70 invoice price as an indicator of the value of the damage cargo[16] and the conclusion that the discount allowance resulted in a windfall to Otto Wolff, are unfounded.

In sum, TradeArbed did not recondition the rebars because the cost of refurbishing would have exceed the degree of the damage. Neither did it resold the cargo at the market rate nor at salvage because, being the market glutted, it would have never received a 67% return. **See**, Capt. Yoos' Report, p. 3-4, Exhibit #12, Motion for Partial Summary Judgment, docket entry #37. Instead, after the surveyors appraised the damaged cargo, TradeArbed sold it to Otto Wolff at a discount price that represented the best measure of mitigation of damages. More over, if the cargo had not been damaged,

---

[16] We take note that Gomez' deposition was taken the cay after Capt. Simpson rendered his expert report.

**CIVIL NO. 98-2359 (GG)**                                           31

TradeArbed would have sold the rebars at the previously convened
price with Otto Wolff and would have obtained a greater profit than
what it eventually received because it would not have had to agree
to a discounted price. However, by so doing, TradeArbed absorbed the
loss of the damaged cargo. Hence, it is TradeArbed, *ergo*, MOAC and
Continental, who must be made whole in this case. Since, there are
no adequate values in this case to use the market value formula and
the damaged absorbed by the plaintiffs is reflected in the discounted
price of the rebars, we find that the discount allowance test is an
appropriate measure to calculate damages in this case. The courts
have found that negotiated discounts to the invoice values for the
bill of lading is a reasonable measure of damages. **See**, <u>TradeArbed,
Inc. v. M/V Swallow</u>, 688 F.Supp. at 1107; <u>Thyssen, Inc. v. S.S.
Fortune Star</u>, 777 F.2d 57, 61-62 (2d Cir.1985) (applying market
discount measure of damages to resale of steel pipe by consignee at
discount without reconditioning); <u>Thyssen, Inc. v. S/S Eurounity</u>, 21
F.3d at 539-540.

Finally, the defendants argue that the surveyors' fees,
claimed as part of the damages by the plaintiffs are not recoverable.
In addition to the actual loss or damage to the cargo, there usually
arise necessary expenses incidental to the damage sustained. These
expenses include survey fees, necessary transportation, warehousing,
and the like. **See**, <u>Continental Distrib. Co. v. Reading Co.</u>, 168 F.2d
967 (3rd Cir. 1948). Such incidental expenses are recoverable if they
were reasonably considered necessary at the time they were incurred.

**CIVIL NO. 98-2359 (GG)**                                                  32

**See**, <u>Santiago v. Sea-Land Service, Inc.</u>, 366 F.Supp. at 1317.  During the deposition of Francisco Garcia, Ferromontan's CEO, he declared that despite the fact that there is a claim or not, Mr. Catanzaro is hired by the company to inspect the condition of the shipments that arrive regardless of whether there is any claim of damage to cargo. **See**, García's Deposition, p. 13, Exhibit #5, Memorandum of Law in Support of Opposition to Plaintiff' Motion to Partial Summary Judgment and Defendants' Cross Motion For Partial Summary Judgment, docket entry #43.  This demonstrates that Mr. Catanzaro's survey was part of routine inspections made to shipments delivered to Otto Wolff at the port of San Juan. In other words, said cost is a fixed expense of the company.  Clearly then Otto Wolff was not forced to incur in the same due to fault of the defendants.  Therefore, Mr. Catanzaro's survey fees are not recoverable.

**WHEREFORE**, for the reasons herein stated, the plaintiffs' motion for partial summary judgment is **GRANTED** and the defendants' cross motion is **DENIED** in part and **GRANTED** exclusively in regards to the survey fees.

In San Juan, Puerto Rico, this /3th day of November, 2003.

GILBERTO GIERBOLINI
U.S. District Judge